DOMINGO MATOS RODRÍGUEZ ET AL., Plaintiffs, Appellees and Appellants, *v.* CÁNDIDO SALVAT MALDONADO ET AL., Defendants, Appellants and Appellees.

No. 8078. Argued May 3, 1940.—Decided May 22, 1940.

*Antonio E. Suliveres* for defendants, appellants and appellees. *Luis Mercader* for plaintiffs, appellees, appellants.

Mr. Justice De Jesús delivered the opinion of the court.

The main issue in the appeals taken by both sides in the instant case is whether the trial court committed error in weighing the evidence.

That for the plaintiffs tends to show that Jaime Matos, a policeman, had acquired several years ago, partly by inheritance and partly by purchase, two pieces of rural property of 33.60 and 19.40 cuerdas respectively located in the municipal district of Utuado. Being unable to manage them personally owing to his official duties he placed his brother Froilán Francisco Matos in charge of them ever since he acquired them. The latter tilled them and lived on one of them with his wife and children.

It does not appear from the evidence that Jaime Matos paid his brother any salary for his services, but it does appear that he used to support Froilán and his family.

Subsequent to the acquisition of the properties he married Iraida Medina, a nurse, and the couple lived on their respective salaries. They had no issue and went on living in town. After they had been married for several years he was transferred from Utuado to the town of Jayuya where he was killed a few days afterwards, about 1935. As he left no forced heirs, either ascendants or descendants, his brothers would be entitled to the inheritance. On his death his widow Iraida Medina kept several papers including a promissory note to bearer subscribed by Jaime Matos on May 8, 1934, payable on demand and secured by a mortgage upon the two pieces of property mentioned. Shortly after, his widow, who was not interested in the two pieces of property as separately belonging to her husband and because she had been paid by the Government, as stated by her, some $4,000 as compensation for her husband's death, delivered the promissory note to Froilán who, according to her, had requested the same in order to take certain steps in connection with some deeds. Froilán died two years afterwards and the promissory note fell into the hands of Cándido Salvat who had married one

of Froilán's wife's sisters. Once in possession of the note, Salvat instituted summary foreclosure proceedings for its collection, which proceedings led to the adjudication of the pieces of property to the creditor in satisfaction of the note. Notwithstanding this adjudication, Froilán's widow has continued living on the estates, acting as the owner thereof as if no such adjudication had taken place.

Jaime's brothers, plaintiffs herein, brought this action for the annulment of the summary proceedings and the subsequent adjudication of the properties to Salvat, praying also that the defendants be adjudged to pay for the fruits from the two parcels of land.

The evidence for the defendants tends to show that two months after subscribing the note, Jaime went to see his brother Froilán and delivered the note to him as compensation for his management of the properties during several years. At times they testified that the delivery was absolute and at others that he delivered the same as security, but it never transpired that any liquidation was made or a certain amount was mentioned as the total of the alleged obligation.

It is well to state here that Froilán's widow, while testifying for the defendants, asserted that her husband used to take the fruits from the properties, that Jaime received nothing from them and that the latter lived upon his and his wife's earnings. (Transcript of evidence, p. 187.)

Two years after the death of Jaime, Froilán died after a long illness, but before he died he sent for Cándido Salvat, and as the former, according to the defendants, owed to the latter about $1,400 on account of goods bought in Salvat's small roadside store and of crop loans for the tilling of the farms, for which at times, according to the defendants, he borrowed from him $25 weekly, he delivered the note to Salvat with the request, in the event of the execution of the mortgaged properties, to return to his wife and children any excess over $1,400 from the proceeds of the judicial sale; and, if there were no bids and the properties were

adjudicated to him, then to pay them $1,000 cash. No instrument was executed to put this agreement in writing. After the properties were adjudicated to Salvat, according to him and to Froilán's widow, and in compliance with the terms of the agreement, the former handed to the widow $650 in cash, and as he had leased to her the properties for $250 annually payable in advance, he retained the said amount, and still owed $100 to Froilán's widow under the terms of the agreement entered into with her husband.

The lower court gave no credence to the evidence for the defendants and, commenting thereon, expressed itself as follows:

"The explanation of the defendants for the purpose of showing how the promissory note fell into the hands of Salvat, the more it is considered the less convincing it becomes. It is a story badly conceived and worse expounded." (Judgment roll, p. 28.)

Further on, in the course of the opinion, when analyzing the evidence itself, it said:

"Salvat testified that at the time he acquired the $3,500 obligation, he had declared in his property-tax return a small piece of property. The sum paid by him as taxes showed that the same was not worth more than $500. He further testified that about that time he worked for the P.R.R.A. and earned $90. It is hard to conclude that he could carry out the deals with which he pretends to explain away his acquisition of the mortgage security.

"Besides the relationship of Salvat to Angela Matos, there is another circumstance leading to the conviction that the conveyance had been simulated. Salvat never took possession of the properties after their judicial execution. The widow of Francisco Matos and her children have continued in possession thereof until the present. There was introduced in evidence a paper alleged to be a lease executed by Salvat to Francisco's widow. This paper was executed subsequent to the filing of the original complaint in this suit. It is sufficient to read the statement made by defendants at the end of their answer, in which it is said that the properties have never produced sufficient to repay the money disbursed for their upkeep, in order to conclude that the yearly rental of $250 and the taxes, which were set forth in the said lease contract was a fanciful sum which could never have been paid by the alleged lessee."

The evidence for the defendants convinces us that the trial judge rightly resolved the conflict in the evidence in favor of the plaintiffs. Let us see.

Let us first consider the theory of the defendants as to how the promissory note to bearer came into Froilán's possession. According to the testimony of the latter's widow, perhaps the person best qualified to testify thereon,—for which reason we can not doubt her testimony as she is one of the defendants—it appears that Froilán would get the fruits of the properties and that Jaime Matos got nothing as the latter lived on his salary and on the earnings of his wife who, as appears from the evidence, was a nurse who worked in the Municipal Hospital of Utuado. If this was so, what obligation could have been incurred by Jaime towards Froilán by reason of the management of the properties requiring the payment of a sum which, according to the testimony of the defendants, was greater than the value of the properties themselves? Rather the contrary, it was Froilán who gratuitously had profited from the property of his brother and if there was to be any debtor, it must have been Froilán and not Jaime Matos who had not personally profited from his brother's work. In the second place, assuming without conceding that Jaime Matos had intended to benefit his brother, why should he deliver to him a promissory note to bearer secured by mortgage, payable on demand, thus exposing himself to the risk of his brother endorsing the same whereupon his properties might be executed without regard? If it was his purpose to help his brother, it would have been easier for him to give his brother some amount in cash, or to acknowledge an indebtedness to him in a certain sum, or even to donate him part of his properties, which could easily be done as they were his separate property and he had no forced heirs.

Let us consider now how the promissory note, according to the defendants, came into the possession of Salvat. It appears from the evidence that Salvat's wife and Froi-

lán's wife were sisters; that Salvat was a person of small means and that the establishment where Froilán ran a bill amounting to the respectable sum of $1,400 was "a small roadside store," as stated by Salvat himself, some of the witnesses for the plaintiffs testifying that his stock of goods at times was worth $25, at others $50, and some times there were no goods. Apart from these facts, it is hard to believe, assuming the existence of the obligation, that Froilán, who was an experienced man, in need of and owing money, should retain a promissory note for three years (he died in 1937), without taking any steps to collect or negotiate the same, and, on feeling that the end of his life was near, should send for the creditor in order to hand him a security worth almost twice as much as his debt, thus placing the future of his family at the mercy of his creditor, without even taking the trouble to put in writing the agreement entered into, a thing which could easily be done, inasmuch as, according to the evidence for the defendants, the deal was carried out in the presence of witness Alvarez, a school teacher who, being pressed by the plaintiffs, finally admitted that one of his brothers was married to one of Salvat's sisters.

The plaintiffs contend that the trial court erred in dismissing the second cause of action of the complaint in which fruits were claimed, and that it also erred in failing to adjudge the defendants to pay attorney's fees.

Referring to the second cause of action the trial court expressed itself as follows:

"The plaintiffs failed to introduce specific and convincing evidence on which we could rely for a fair determination of the second cause of action regarding damages."

The trial court is right. Daniel Ramos Matos and Domingo Matos Rodríguez were the only witnesses who testified regarding this particular. From the cross-examination of the former we quote as follows:

"Q. Did you see Jaime Matos' property at the time of the San Felipe Cyclone?—A. Not inside.

"Q. Have you inspected it after San Felipe?—A. I have not.

"Q. And without an inspection of it you say it can yield four hundred pounds of coffee?—A. That is the average. I am talking of an average and it may be more or less.

"Q. Did you see the property prior to San Felipe?—A. I have passed by it.

"Q. Along the road?—A. Yes, Sir.

"Q. Do you not know how many cuerdas are planted to lesser crops?—A. I pass by on my way to my farm and from the road I see part of it.

"Q. Do you not know how many cuerdas there are?—A. No, Sir.

"Q. Why do you say that there are eight cuerdas planted to coffee since you have not seen the farm for the last ten years?—A. It is an estimate.

"Q. You do not know either how much was planted to tobacco?—A. Jaime Matos told me.

"Q. What you know of your own knowledge.—A. I think there were planted...

"Q. Not what you think, but what you know.—I do not go and inspect....

"Q. And why do you think that about 11 or 12 cuerdas were planted?—A. Once he told me....

"Q. Who?—Jaime Matos.

"Q. Do not tell me what he said. Have you got your information about the matter from what Jaime Matos has told you?—A. Yes, Sir, that he had inherited 11 cuerdas.

"Q. Have you not seen the property since before the cyclone?—A. Well, I have passed by it."

Likewise, from the cross-examination of the latter we transcribe as follows:

"Q. Do you know how much coffee was harvested last year from this farm?—A. I do not know exactly, as I did not make a note of it.

"Q. Year before last, do you know how many hundredweights were yielded by those two properties?—A. I do not know either.

"Q. And in 1935, do you know how many hundredweights of coffee were gathered from that property?—A. No, Sir.

"Q. You then make an estimate according to the plantation, the planting and the number of trees thereon, but you do not know the yield?....

"Q. Do you know whether last year's crop was good or bad?—A. Indifferent.

"Q. Have you not heard it said by farmers that it was bad and that they were ruined?—A. Yes, Sir; but crops are bad always.

"Q. But relatively?—A. Indifferent. It was neither of the best, nor of the worst.

"Q. Do you not know how much that property yielded? How much land had been planted to sweet potatoes?—A. Three cuerdas.

"Q. And eight to coffee?—A. Yes, Sir.

"Q. How many to bananas?—A. Three cuerdas also.

"Q. You say that there was a yield from eleven cuerdas of tobacco. How many were planted last year?—A. Eleven cuerdas.

"Q. How much tobacco was gathered?—A. There the minimum yield is between six or seven hundredweights.

"Q. Do you know the price at which the tobacco was liquidated? —A. I did not care.

"Q. Do you not know whether there were losses or profits from the tobacco crop?—A. I do not know.

"Q. Are you a tobacco grower?—A. I am."

(Transcript of evidence pp. 131, 132.)

■ We agree with the plaintiffs, that in a case like this, in which not only there has been obstinacy but even bad faith on the part of the defendants in seeking to deprive the plaintiffs of their lawful property, the trial court did not properly use its discretion by failing to allow the plaintiffs a reasonable sum as attorney's fees, even though there were minors among the defendants.

■ The defendants complain that the trial court admitted in evidence the notarial act of the demand served by the plaintiffs through Notary F. Figueroa Maestre on defendant Iraida Medina, widow of Jaime Matos; that it also erred by allowing the notary and one of the witnesses to testify as to the contents of the act which, according to the defendants, is void for lack of the signature of the party served with the demand, and, moreover, the attesting notary was at the time counsel for the plaintiffs, and it was also alleged that the statements made by Iraida Medina were privileged communications because she was then the notary's client.

The fact that the notarial act had not been signed by the person served with the demand does not render the same inadmissible in evidence. The notary bears witness to the statements made in his presence by the person served with the demand and it is the attesting by the notary and not the signature of the person served with the demand that imparts the probatory value to the act. See *Colón* v. *The Shell Co. (P. R.) Ltd.*, 55 P.R.R. 575.

██ But apart from the admissibility of the act and from the statement of witness Figueroa Maestre, the testimony of Daniel Matos Ramos, irrespective of the act and of the testimony of Figueroa Maestre, tends to show that the note to bearer, as told by Iraida Medina, was in her possession for some time after her husband's death. We transcribe from the testimony of said witness as follows:

"Q. This mortgage promissory note, where was it when Jaime Matos died?—A. In possession of his wife Iraida Medina.

"Q. How do you know that it was in her possession?—A. In the first place we knew it was there.

" .        .        .        .        .        .

"Q. How do you know it?—A. We had a meeting and she talked and left all her papers and she was asked to keep them. (Transcript of evidence, p. 93.)

" .        .        .        .        .        .

"Q. After his death (Jaime Matos'), how do you know that it was in his widow's possession?—A. We had a meeting and she mentioned the papers and what she intended to do and the mortgage note was among them.

"Q. Did you meet for that purpose?—A. Yes, Sir. We met several times and she was authorized to keep it.

"Q. Did she keep anything else besides that note?—A. The deeds.

"Q. What deeds?—A. The deeds to the properties.

"Q. Did all authorize her to go on keeping them?—A. Yes, Sir.

"Q. Did she continue in possession of that note to bearer and of the papers?—A. Always.

"Q. For how long?—A. Until 1937 when we were told that the note was no longer in her possession. (Transcript of evidence, p. 94.)

Assuming that the court had committed error in admitting the notarial act and in permitting Notary Figueroa Maestre to testify, such error, if any, could not be prejudicial to the defendants, because, even discarding such evidence, the testimony of Ramos sufficiently shows the statements made by Iraida Medina to the effect that at the time of her husband's death she was in possession of the promissory note in controversy. We may, however, go still farther and even discard entirely the testimony of Daniel Ramos, inasmuch as the rest of the evidence before the trial judge is so preponderant as to sustain by itself the judgment rendered.

From the foregoing, the judgment appealed from must be modified so as to further adjudge the defendants to pay the sum of $200 as attorney's fees, and, so modified, the judgment shall be affirmed.